UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: SEP 09 2015
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
N-TRON CORPORATION,                               :
                                                  :
                                                  :
                        Plaintiff,                :
                                                  :
        -against-                                 :          OPINION
                                                  :
WARREN H. NICHOLSON, ROBERT A.                    :          12 Civ. 3568 (GBD)
NICHOLSON, THOMAS SHAW, KATHY S.                  :
NICHOLSON, and MARY S. NICHOLSON,                 :
                                                  :
                                                  :
                        Defendants.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

This action arises from alleged misrepresentations and omissions in a written Asset

Purchase Agreement ("APA"), dated August 20, 2010, between Plaintiff N-Tron *Corporation*

and Defendants, shareholders of N-Tron *Corp.*[1]  Plaintiff purchased substantially all of N-Tron

Corp.'s assets on September 30, 2010 at the close of the transaction covered by the APA.  The

Complaint highlights several sections of the APA that Plaintiff alleges are "categorically untrue."

(Complaint ("Compl.") ¶¶ 3-4.)  Accordingly, Plaintiff brings claims for breach of contract and

fraud.  Plaintiff primarily argues that the former chief executive officer of N-Tron Corp.,

Defendant Warren H. Nicholson ("Defendant Nicholson"), failed to disclose material

information prior to the transaction's closing, thereby violating the representations and

warranties in the APA.

Defendants now move for summary judgment.  Defendants' motion for summary

judgment is GRANTED.

---

[1] N-Tron Corp. and N-Tron Corporation are two separate entities.  Plaintiff N-Tron Corporation was
formed to acquire N-Tron Corp.

## I.   PROCEDURAL BACKGROUND AND ALLEGATIONS

Plaintiff filed the Complaint in the Supreme Court of New York, County of New York. Defendants removed this action to federal court pursuant to 28 U.S.C. §§ 1332(a), 1441, and 1446.

Plaintiff is a corporation organized under the laws of Delaware, and its principal place of business is in Mobile County, Alabama.  (Compl. ¶ 9.)  Plaintiff "develops, manufactures, and markets Ethernet network infrastructure equipment designed to operate in harsh industrial environments."  (*Id.*)  Plaintiff was specifically formed for the purpose of carrying out the transaction at issue.  In late 2009, third parties Red Lion Controls, Inc. ("Red Lion") and its ultimate U.K. parent, Spectris plc ("Spectris") began discussions with Defendant Nicholson concerning the possible acquisition of N-Tron Corp.  (*Id.* ¶ 18.)  Together, "Red Lion and Spectris formed 'N-Tron Corporation' to hold their interests in the business following consummation of the transaction."  (*Id.* ¶ 19.)

Defendant Nicholson is the former president, chief executive officer, principal shareholder, and representative of N-Tron Corp. who was responsible for negotiating the terms of the APA on behalf of N-Tron Corp.  (*Id.* ¶ 10.)  The other individual defendants, along with Defendant Nicholson, were its shareholders.[2]

The Complaint discusses N-Tron Corp.'s pre-acquisition relationship with General Electric Company ("GE").  Specifically, the Complaint alleges that GE was N-Tron Corp.'s "most significant customer" both in terms of dollar volume of GE's purchases and GE's

---

[2] The shareholders, other than Defendant Nicholson, had no role in negotiating or drafting the APA. They each submitted declarations stating that they "have no knowledge regarding, and cannot testify to, the veracity of any of the representations and warranties made to [Plaintiff] on behalf of N-Tron Corp. and its shareholders, either in the APA itself or in the negotiations leading to its execution and closing." (Stipulated Order, Exhibits 1-4 (ECF No. 57).)  Plaintiff characterizes these defendants' statements as "additional material facts as to which there exists a genuine issue to be tried."  (Plaintiff's Rule 56.1 Statement ("Pltf. R. 56.1 Stmt.") ¶ 81.)

contribution to N-Tron Corp.'s profitability.  (*Id.* ¶ 22.)  "In particular, N-Tron Corp. was GE's sole supplier of Ethernet network infrastructure equipment for certain wind turbine requirements."  (*Id.*)  Defendants concede that these facts regarding the relationship with GE are accurate.  (Answer (ECF No. 3) ¶ 22.)  Plaintiff alleges that Red Lion and Spectris wanted to meet with GE "both to introduce the transaction and to discuss N-Tron's future relationship with GE," but Defendant Nicholson "precluded . . . any such communications prior to the execution of the APA."  (Compl. ¶ 24.)

Plaintiff first alleges that "[a]lthough Nicholson vaguely indicated that GE was in the process of qualifying an alternate supplier of certain equipment, he repeatedly claimed to know nothing about the status of the qualification process and downplayed its significance (including characterizing it as 'inching along')."  (*Id.* ¶ 25.)  Plaintiff alleges that, despite his representations to the contrary, Defendant Nicholson *knew* prior to closing that GE had approved Hirschmann Automation Control ("Hirschmann") as an alternate supplier and that Hirschmann had lower prices.  (*Id.* ¶¶ 6, 33.)  Plaintiff alleges that withholding this information and making contrary representations is fraudulent and constitutes a breach of Sections 5.5, 5.21, and 5.25 of the APA.  (*See* Appendix A (including excerpts from these Sections).)

Plaintiff next alleges that Defendants are responsible for any legal fees Plaintiff has or will incur in defending against third-party Siemens AG's ("Siemens") potential patent infringement claim.  (Compl. at 11-12.)  On or around November 22, 2010, Plaintiff claims it received a letter from Siemens stating that Plaintiff's "managed switches" improperly made use of a patent owned by Siemens.  (*Id.* ¶ 36.)  Although Plaintiff does not allege that it has been sued by Siemens, it claims it "was forced to hire a patent attorney in order to institute a search for prior art and then analyze and respond to Siemens' claim, and incurred legal fees in

connection with this effort." (*Id.* ¶ 40.) Plaintiff alleges that Defendant Nicholson conceded that he was aware of the Siemens/Hirschmann United States patent, and that he was offered a patent license agreement in 2008, which he rejected. (*Id.* ¶ 39.) Plaintiff contends that Defendants therefore violated Section 5.11(f) of the APA because they had knowledge of a claim of infringement. (*See* Appendix A.) Plaintiff is no longer proceeding under a fraud theory as it relates to the Siemens patent. (*See* Plaintiff's Opposition Brief, ("Pltf. Opp. Br.") at 8 n.5 ("With respect to Defendants' argument regarding Plaintiff's fraud claim as it relates to the Siemens patent . . . Plaintiff has elected not to pursue that claim.").)

Plaintiff argues that because Defendants violated Section 5.11(f) of the APA, they are obligated "to indemnify and hold harmless [Plaintiff] from and against any and all Losses and Expenses (including damages, attorneys' fees, and litigation expenses) arising from 'any breach of any warranty or the inaccuracy of any representation of Seller or any Shareholder contained in [the APA].'" (Compl. ¶ 29 (citing APA § 9.1).)

## II.   FACTUAL BACKGROUND

Plaintiff's contract claim (Count I) is based on Defendants' alleged breach of the representations and warranties contained in Sections 5.5, 5.21, 5.25, and 5.11 of the APA. Plaintiff's fraud claim (Count II) is based on Defendants' alleged misrepresentations of material facts and/or failure to disclose material facts, including information Defendants possessed regarding the status of GE's second sourcing efforts and Hirschmann's pricing. (Plaintiff's Rule 56.1 Statement ("Pltf. R. 56.1 Stmt.") ¶ 59.)

A. **Facts Related to GE's Second Sourcing Efforts**

By late 2009, Spectris had begun an in-depth investigation into N-Tron Corp. as a potential acquisition target.[3]  (*Id.* ¶ 7.)

At all relevant times, Spectris was aware that N-Tron Corp.'s largest individual customer was GE, which accounted for a significant percentage of N-Tron Corp.'s sales and profits.  (*Id.* ¶ 17.)  Historically, N-Tron Corp. relied on GE for between 34% and 42% of the company's annual sales.  (*Id.* ¶ 19.)  During the due diligence process, Spectris was made aware that GE would be pursuing a second source for the products GE had been purchasing exclusively from N-Tron Corp.  (*Id.*)

In January 2010, Defendant Nicholson was told by GE's corporate representatives in the United States to "ignore any communications with China respecting pricing."  (*Id.* ¶ 37.)

On March 6, 2010, Defendant Nicholson received an email from Jimy Jiang of Witjoint, one of N-Tron Corp.'s distributors in China, stating that he "just got information that GE now is using Hischmann [sic] switch for test.  Many Hirschmann guys including global industry manager are doing the job.  I don't know if it is true or not."  (*Id.* ¶ 22.)

On March 25, 2010, Chris Matthews, N-Tron Corp.'s Asia sales representative, also received an email from Jiang.  Jiang wrote that he "got the same information from Viasystem," a Chinese contract manufacturer for GE, "that Hirschmann switch had passed the test in Salem."  (*Id.*)  The email further stated that "[i]t is just used for 1.5MW machine."  (*Id.*)  Defendant Nicholson learned of this communication from Matthews in late March 2010.  (*Id.*)

As early as April 2010, Defendant Nicholson received "information" through Matthews, who, in turn, received the "information" from Witjoint, which was given the information by

---

[3] According to Plaintiff, formal diligence regarding the acquisition commenced after the parties executed a Letter of Intent in April 2010.  (*Id.* ¶ 6.)

Viasystems that Hirschmann's prices were better than N-Tron Corp.'s prices for comparable switches. (*Id.* ¶ 36.)

On April 6, 2010, Defendant Nicholson held a conference call with three of GE's United States representatives. After the call, Defendant Nicholson circulated the minutes of that call to the GE participants via e-mail, and he asked the participants to advise him if anything in his minutes needed to be corrected. (*Id.* ¶ 38.) In the minutes, Defendant Nicholson wrote that the GE domestic representatives told him during the call that certain information he received from China—that GE Viasystems and GE Shanghai would begin buying all of their switches from Hirschmann in the fourth quarter of 2010—was "flat out not true." (*Id.* ¶ 39.) In addition he wrote: "It is also my understanding that this second sourcing is a work in progress, not scheduled to be completed in the near future." (*Id.* ¶ 40.) The GE U.S. participants did not dispute or correct the minutes.[4] (*Id.* ¶ 41.)

On July 13, 2010, Matthews forwarded to Defendant Nicholson an email that Matthews received from Elyen Zhou at Witjoint. The email attached a document that, according to Matthews, "Witjoint received from Viasystems." (*Id.* ¶ 22.) The attachment, according to Plaintiff, is a GE specification dated April 6, 2010, identifying Hirschmann as an "Approved Supplier[]" to GE (the "April 6 Specification"). In addition, the attachment lists three specific Hirschmann parts as alternatives to N-Tron Corp. switches. (*Id.*) This email and attachment were forwarded by Defendant Nicholson to Richard Whitehurst, N-Tron Corp.'s then-CFO. In

---

[4] Plaintiff argues that the depositions of two of the GE participants on this call, Amanda Strong and Ann Marie Monahan, demonstrate that the information contained in the minutes was disputed by the call participants, even though they did not say so at the time. Defendants argue that the depositions do not show that anything was disputed except the accuracy of Defendant Nicholson's reference to a likely 90/10 "split" between GE's primary source (N-Tron Corp.) and potential secondary source in the future. Neither deponent recalled that being specifically stated during the call of April 6, 2010. (*Id.* ¶¶ 40-41.) Moreover, Plaintiff notes that Nicholson did not discuss all of the specific information he received the month prior from China. (*Id.* ¶ 38.)

his email to Whitehurst, Defendant Nicholson wrote: "This is not good news . . . ." (*Id.*) Defendant Nicholson responded separately to Matthews and asked him to "[f]ind out Viasystems price for the Hirschmann parts." (*Id.*)

On July 15, 2010, Matthews responded to Defendant Nicholson, explaining that Jiang told him that the Viasystems purchasing manager's computer screen, which he showed Jiang, reflected that "the bundle of three switches from Hirschmann was just under US$1000." (*Id.*) Defendant Nicholson replied and asked Matthews the cost breakdown for the three switches. (*Id.*)

On July 21, 2010, Matthews forwarded to Defendant Nicholson another email from Jiang, in which Jiang wrote that he "just got some information that Hirschmann switch price is USD$950 ~ USD$980 (total price 3 parts).  Only half of N-TRON price !!"  The email stated further that "Hirschmann has been confirmed as a qualified supplier of ethernet switch." (*Id.*)

On July 28, 2010, Defendants' counsel proposed adding language to the APA regarding GE's second sourcing efforts.  The final language included is reflected in Schedule 5.21 to the APA:

> The wind division of General Electric Company adopted a policy whereby it is pursuing a second source for its products, which includes Products sold by Seller to General Electric Company.  Accordingly, Seller can make no assurances that the adoption of such policy by General Electric Company will not result in decreased sales of Products to General Electric Company, decreased revenues from such sales and/or decreased profit margins associated therewith.

(APA Schedule 5.21 (also included in Appendix A).)  Spectris was aware of GE's second sourcing policy through discussions with Defendant Nicholson prior to inclusion of the Schedule 5.21 language in the APA.  (Pltf. R. 56.1 Stmt. ¶ 21.)  Spectris was specifically aware that the second source in Schedule 5.21 referred to Hirschmann.  (*See* Tr. 57:16-58:4 (Oct. 22, 2014).)[5]

---

[5] "THE COURT: So you knew prior to entering the [APA] that second source referred to Hirschmann?

On August 20, 2010 the APA was executed by Plaintiff and N-Tron Corp.'s shareholders, including Defendant Nicholson.

Defendant Nicholson had another conversation with the same three GE U.S. representatives on August 30, 2010. He testified that individuals at Spectris gave him a document including what he could and could not say when communicating with GE. (Pltf. R. 56.1 Stmt. ¶ 45.) After the August 30 call, he sent minutes to the GE representatives, and wrote: "Please feel free to approve or add comments as appropriate." (Pltf. R. 56.1 Stmt. ¶ 46.) In those minutes, Defendant Nicholson wrote: "I then brought up the status of the Hirschmann second source of N-Tron. I asked how that was going, and Dinesh indicated it was inching along. Dinesh re-iterated it was still a priority from their COO, but Engineering resources were working on higher priority projects, and GE left me with the impression it wasn't something that was imminent or something I needed to be overly concerned with." (Id. ¶ 47.) Defendant Nicholson did not expressly raise the April 6 Specification in his call. No GE representative responded with comments or corrections to Defendant Nicholson's minutes. (Id. ¶ 48.)

On September 2, 2010, N-Tron Corp. sent Spectris/Red Lion a letter ("the Customer Condition Certification") that transmitted a copy of Defendant Nicholson's August 30, 2010 GE conference call minutes. The letter stated in part: "Sellers' Representative hereby certifies that (a) Warren Nicholson and certain representatives of General Electric Company . . . discussed certain matters on August 30, 2010, as requested by Jeremy Morcom, Corporate Development Officer with Spectris plc, which discussion . . . is described in the email, dated August 31, 2010, from Warren H. Nicholson to Ann Marie Monahan [of GE], a true and correct copy of which is

---

MR. RANSOM: We learned that Hirschmann had been identified as the targeted second source, yes." (Tr. 56:16-19 (Oct. 22, 2014).)

attached hereto ("the Email"), and (b) the Email constitutes a complete and accurate record of the Discussion." (*Id.* ¶ 62.)

On September 30, 2010 the transaction closed, and Plaintiff acquired almost all of the assets of N-Tron Corp. through the APA. (*Id.* ¶ 1.)

On January 6, 2011, Scott Gibbs of Red Lion emailed Mike Granby, President of Red Lion, attaching the April 6 Specification. Gibbs wrote: "I was told by Warren that the specification was just a DRAFT and that he thought it was intentionally leaked by GE to put more pressure on us to negotiate with them. I think there is some potential truth to that . . . if you look at the ordering information . . . the ordering information is not correct. . . . Also, Dinesh Sekar, GE, told me that the spec was preliminary and he was not happy that we had received a copy. The document is also not marked in the document control areas of the spec." (*Id.* ¶ 54.)

The evidence is not definitive regarding when Hirschmann was approved by GE as a second source. Defendants cite a report by Matthews to argue that as of June 2011, Hirschmann was not yet approved as a second source.[6] Plaintiff cites the same report to contend that at least by that time Hirschmann was fully approved as a second source.[7] Moreover, the parties rely on

---

[6] On March 23, 2011, Matthews reported on a March 22, 2011 meeting with the purchasing manager of Viasystems, among others. In his report, Matthews explained that Viasystems' executives discussed the status of GE's second source approval of Hirschmann. He wrote: "[B]y June, they will have finished their first prototype using three Hirschmann switches replacing N-Tron. After this unit is sent to the US and approved they expect to transfer all business to Hirschmann due to price." (Pltf. R. 56.1 Stmt. ¶ 50.) Defendants also rely on a December 15, 2012 email from Scott Gibbs of Red Lion to Mike Granby, President of Red Lion, with notes from Gibbs's December 13, 2010 meeting with GE. Gibbs wrote: "[GE] said that their investment in getting Hirschmann approved as a second source was near completion." Gibbs also explained how pricing may change "*when* [GE] go[es] to second source." (Decl. of Douglas L. McCoy ("McCoy Decl."), Exhibit LL (emphasis added).)

[7] In a portion of the same March 23, 2011 report relating to a meeting with Vincent Ping, a purchasing manager for GE Guandian, it states that "Hirschmann has been fully approved as a vendor and if he chose to replace N-Tron he could do so at his discretion." (Pltf. R. 56.1 Stmt. ¶ 49.)

conflicting deposition testimony to support their respective theories regarding when Hirschmann was approved. (*See* Pltf. Opp. Br. at 13-15; Defendants' Brief in Support ("Def. Br.") at 12.)[8]

### B. Facts Related to the Siemens Patent

In 2008 and 2009, N-Tron Corp. considered licensing certain "Media Redundancy Protocol" ("MRP") software from Siemens for a possible future product feature. (Pltf. R. 56.1 Stmt. ¶ 63.)  The proposed MRP software license included a license to the Siemens patent. (*Id.* ¶ 64.)  While N-Tron Corp. claims it was not interested in the Siemens patent, it negotiated for the software-patent bundle in order to license the software. (*Id.* ¶¶ 65-67.)  Siemens proposed a licensing agreement that licensed both the MRP software and the Siemens Patent. (*Id.* ¶ 69.)  The proposal did not claim that N-Tron Corp. engaged in patent infringement. (*Id.* ¶ 70.)  Defendants eventually decided not to pursue the license and never executed a proposed license agreement involving the MRP software or the Siemens patent. (*Id.* ¶¶ 71-72.)

On November 22, 2010, Plaintiff received a letter from Siemens stating that it was Siemens' opinion that Plaintiff's "managed switches" used the Siemens patent. (*Id.* ¶ 76.)  Plaintiff retained independent legal counsel to investigate the allegation. (*Id.* ¶¶ 77-78.)

On January 19, 2011, Plaintiff provided Defendant Nicholson with a Claim Notice pursuant to Section 9.3 of the APA related to "[b]reaches of and inaccuracies in the representations and warranties set forth in Sections 5.11 and 5.25 (and possibly other representations and warranties) of the [APA]." (*Id.* ¶ 83.)  Defendants responded on February

---

[8] Defendants rely on the deposition testimony of two GE employees, Ann Marie Monahan, who was the Senior Global Commodities Leader for GE Energy at the relevant time, and Amanda Strong, who was the Commodities Site Leader for GE at the relevant time, to argue that Hirschmann was not approved as of January 2011. (Defendants' Brief in Support ("Def. Br.") at 12.)  Plaintiff argues that the deposition testimony of these two witnesses shows that Ms. Strong did not recall when Hirschmann was approved, and Ms. Monahan testified that approval was in mid-2010. (Plaintiff's Opposition Brief, ("Pltf. Opp. Br."), at 13-15.)

15, 2011, "den[ying] each allegation of wrongdoing," but conceding that Defendants were "aware of the Siemens/Hirschmann United States patent for a number of years." (*Id.*)

Plaintiff's counsel explained in a letter to Siemens, dated April 26, 2011, that "[i]n view of the doubtful application of the [Siemens Patent] to products as manufactured and sold by N-Tron and the clear prior art that refutes any argument that the [Siemens Patent] is valid, N-Tron can not [sic] accept a license in the [Siemens Patent] as Siemens proposes." (*Id.* ¶ 78.)

### III.   STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" "if it 'might affect the outcome of the suit under the governing law.'" *Id.*

The moving party has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In determining whether a genuine issue of material fact exists, the court must "construe[] the evidence in the light most favorable to the non-moving party, and draw[] all reasonable inferences in its favor." *See Niagara Mohawk Power Corp. v. Jones Chemical, Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286 (citation omitted).

## IV.    BREACH OF CONTRACT CLAIMS[9]

### A. Breach of Contract Claim Related to GE's Second Sourcing Efforts

Plaintiff alleges that Defendants breached the representations and warranties of Sections 5.5, 5.21, and 5.25 of the APA by failing to disclose material facts and making misleading statements regarding (1) GE's potential approval of Hirschmann as a second source, and (2) Hirschmann's relatively low prices as compared to N-Tron Corp.'s prices.   (Compl. ¶ 43.) Plaintiff is no longer alleging that Defendant Nicholson *knew* and failed to disclose that Hirschmann was qualified as an alternate supplier before the parties entered the APA.  To date, neither party knows when Hirschmann was finally approved.[10]  Thus, the only material fact in dispute—*when* Hirschmann was ultimately approved as a second source—is not determinative of Plaintiff's contract claim.[11]   (Pltf. Opp. Br. at 12 ("[I]t is irrelevant whether GE had *actually* qualified a second source as of the closing . . . [because Plaintiff's] claim does not hinge on whether or when Hirschmann was actually qualified.").)   Instead, Plaintiff focuses on the information that Defendant Nicholson learned regarding GE's progress toward approving Hirschmann, which he did not share with Plaintiff.   Therefore, the issue centers on a legal question for decision by this Court, rather than a factual dispute: Did Defendant Nicholson violate the terms of the APA (1) by failing to disclose information that he learned about

---

[9]  The parties have stipulated to the application of New York law to Plaintiff's breach of contract claims.

[10] During discovery, neither party requested documents from nor took the depositions of those individuals at GE or Hirschmann who would be able to potentially answer these questions.  Both parties cite to portions of the depositions of Ann Marie Monahan and Amanda Strong to support their respective arguments regarding the timing of the Hirschmann approval.  Neither Monahan nor Strong definitively knew when Hirschmann was approved by GE.

[11] Even the issue as characterized by Plaintiff is largely a question of law, rather than a factual issue to be tried by a jury: "[A]t a minimum, there is a genuine issue of material fact as to whether the information that Nicholson *did* share was true, complete, and non-misleading, and whether the information that Nicholson did *not* share was information that he was legally obligated to disclose." (Pltf. Opp. Br. at 12.)

Hirschmann, or (2) by making representations that were misleading in light of what he had learned? He did not.

To prevail on a breach of contract claim under New York law, a plaintiff "must establish the existence of a contract containing a bargained-for express warranty with respect to a material fact, reliance on that warranty, a breach of that warranty, and damages suffered as a result of the breach." *Gusmao v. GMT Grp., Inc.*, No. 06 CIV. 5113 (GEL), 2008 WL 2980039, at *5 (S.D.N.Y. Aug. 1, 2008) (citations omitted). The parties' dispute primarily focuses on whether there was a breach of warranty. Plaintiff argues that Defendant Nicholson must establish "that there is no genuine issue of material fact as to what he was told by GE, and as to whether he could properly disregard (and therefore not disclose) the flood of conflicting evidence he was hearing from other sources." (Pltf. Opp. Br. at 17.)

It is undisputed that between March and July 2010, Defendant Nicholson received information regarding the supposed status of the Hirschmann approval, including the five emails that are the focus of Plaintiff's claim.[12] It is also undisputed that after receiving those emails, on July 28, 2010, Defendant Nicholson's counsel proposed adding the following language in Schedule 5.21:

> The wind division of General Electric Company adopted a policy whereby it is pursuing a second source for its products, which includes Products sold by Seller to General Electric Company. Accordingly, Seller can make no assurances that the adoption of such policy by General Electric Company will not result in decreased sales of Products to General Electric Company, decreased revenues from such sales and/or decreased profit margins associated therewith.

(APA Schedule 5.21.)

Thus, Defendants expressly addressed what Plaintiff already knew: that a Material Adverse Effect, as defined in Section 1.1, could occur in the future. Neither party knows at what

---

[12] Specifically, the emails dated March 6, March 25, July 13, July 15, and July 21. (*See id.* at 4-5.)

stage Hirschmann was ultimately approved, but the APA expressly disclosed that approval was a distinct possibility.  Thus, Plaintiff's argument is that Defendants were under an obligation to disclose more information.  However, based on the undisputed facts in this record, Defendants did not breach the representations and warranties as set out in Sections 5.21, 5.25, and 5.5 of the APA.  (*See* Appendix A.)  The information Defendant Nicholson learned—that GE was pursuing a second source with Hirschmann, which could have an impact on the Plaintiff's future sale of products to GE—is consistent with the express terms of Schedule 5.21.

Plaintiff cannot prove on this record what it set out to prove in the Complaint that: Defendant Nicholson *knew* that Hirschmann was an approved second source; he withheld that information from Plaintiff; and he misled Plaintiff through his representations to believe that Hirschmann was not yet approved.  On this record, Plaintiff cannot show that the representations—either in Schedule 5.21 or in the Customer Condition Certification—regarding the status of the Hirschmann approval were inadequate or misleading in breach of the APA.[13]

## B. Breach of Contract Claim Related to the Siemens Patent

Plaintiff explains that "at present, its damages claim [as it pertains to the Siemens' patent] is limited to the legal fees incurred in defending against the Siemens claim." (Pltf. Opp. Br. at 25 n.12.)  Specifically, Plaintiff seeks "the legal fees and costs incurred in *responding* to Siemens." (*Id.* at 25 (emphasis added).)  Construing the facts in the light most favorable to Plaintiff, Plaintiff cannot show that Defendants had knowledge of any actual or potential patent infringement claim in breach of the APA.

---

[13] Plaintiff also cannot demonstrate that it suffered damages as a result of not knowing that Hirschmann might become a second source that would impact Plaintiff's sales.  Plaintiff clearly anticipated this real possibility.

There has been no formal claim of patent infringement against Plaintiff to date.  Instead, Siemens wrote a letter to Plaintiff stating that Siemens is "of the opinion" that Plaintiff's "'managed switches' make use of" a patent owned by Siemens.  (Declaration of Douglas L. McCoy ("McCoy Decl."), Exhibit DD.)  The APA obligates Defendants, jointly and severally, to indemnify and hold harmless Plaintiff "from and against any and all Losses and Expenses arising from . . . any breach of any warranty or the inaccuracy of any representation" in the APA. (Compl. ¶ 29 (citing APA § 9.1(a)(i)).)

The alleged "breach" or "inaccuracy" at issue with respect to the Siemens patent is related to Section 5.11(f) of the APA.  (*See* Appendix A.)   Plaintiff cannot demonstrate, however, that prior to closing there was a "claim of any infringement"; a "basis for" such "a claim against [Defendants]"; or "that the operations, activities, products, Software equipment, machinery or processes of [N-Tron Corp.] . . . infringe[d] . . . any Intellectual Property or any such rights of any other Person."  (APA § 5.11(f).)  There is simply no evidence, disputed or otherwise, that Defendants acquired information that put them on notice of a potential patent infringement claim against N-Tron Corp.  (*See* Pltf. R. 56.1 Stmt. ¶¶ 73-75.)  Plaintiff states that "Defendants were clearly aware of the Siemens patent [and] were clearly aware that it covered technology that was at least related to N-Tron's business."  (*Id.* ¶ 75.)  Despite this argument, Plaintiff—like Defendants—concluded that "[i]n view of the doubtful application of the U.S. '151 patent to products as manufactured and sold by N-Tron . . . N-Tron can not [sic] accept a license" of the Siemens patent.[14]  (McCoy Decl., Exhibit EE at 2.)  However, even if the patent

---

[14] Plaintiff's counsel also stated in his letter to Siemens that Plaintiff's "most fundamental objection to Siemens' proposed license is based on [its] view that the U.S. '151 patent is not valid."  (McCoy Decl., Exhibit EE at 2.)

was "at least related to N-Tron's business," Defendants were under no obligation pursuant to Section 5.11(f) to disclose information about *potentially related* patents.[15]  (*See* APA § 5.11(f).)

Siemens did not make any claims regarding any assertion or threat of patent infringement before the post-closing letter sent to Plaintiff in November 2010.  Plaintiff cannot be indemnified on a theory that Defendants breached the contract because they previously considered purchase of the Siemens patent, but subsequently decided not to execute the proposed license agreement. A reasonable jury could not determine on these facts that Defendants breached the Section 5.11(f) warranty, and Plaintiff therefore is not entitled to the legal fees and costs incurred in responding to the letter from Siemens.[16]

## V.    FRAUD CLAIMS[17]

Plaintiff brings its fraud claims pursuant to Alabama law under theories of both fraudulent suppression and fraudulent inducement.   Defendants argue that Plaintiff's fraud

---

[15] The cases cited by Plaintiff address when an indemnitee may recover legal fees for an *indemnified* claim. *See, e.g.*, *Peter Fabrics, Inc. v. S.S. Hermes*, 765 F.2d 306, 315 (2d Cir. 1985) ("It is established that . . . an indemnitee may recover from his indemnitor attorneys' fees and expenses incurred in defending a claim as to which he is indemnified . . . ."). Here, the claim is only indemnified if there has been a breach of the APA, and there has been no such breach in connection with the Siemens patent.

[16] In its Claim Notice addressed to Defendants, Plaintiff stated that the Claim Notice related to breaches in Sections 5.21 and 5.25 of the APA, and possibly other sections as well.  Plaintiff has not articulated how Defendants' failure to disclose knowledge of the Siemens patent constitutes a violation of Section 5.25.  A reasonable jury could not find—and Plaintiff does not argue—that the disclosure of the Siemens patent was necessary to make other statements in the APA, including Section 5.11(f), "not misleading."  Moreover, Defendants had no basis to believe that the Siemens patent was likely to have a "Material Adverse Effect," as defined in APA Section 1.1.  It had been aware of the patent for years and contemplated licensing the patent, and at no point prior to November 22, 2010 did Siemens suggest that N-Tron Corp.'s business infringed on its patent.

[17] The parties have stipulated to the application of Alabama law to Plaintiff's fraud claims.

claims must be dismissed because they are duplicative of its contract claims and because it is not able to satisfy all of the elements of a fraudulent suppression or inducement claim.[18]

"In Alabama, a single transaction can support an award of damages for both breach of contract and fraud." *Deupree v. Butner*, 522 So. 2d 242, 244 (Ala. 1988) (citation omitted). Defendants rely on *Pearson's Pharmacy, Inc. v. Express Scripts, Inc.* where the district court held that "an alleged written misrepresentation in a contract, without more, cannot be actionable as fraud in Alabama." 505 F. Supp. 2d 1272, 1275 (M.D. Ala. 2007). "Plaintiff[] cannot convert a typical breach of contract into a fraud action without satisfying the elements of both actions." *Id.* at 1276; *see also Hunt Petroleum Corp. v. State*, 901 So. 2d 1, 10-11 (Ala. 2004) (Houston, J., concurring) (citation omitted) (explaining that "to assert a fraud claim that stems from the same general facts as one's breach-of-contract claim, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud"). Where, however, there is evidence "*independent of the contractual promise*" that shows "fraudulent concealments *after* the contract was made," both a breach of contract claim and a fraud claim can stand. *Pearson's*, 505 F. Supp. 2d at 1276-77 (citing *Deupree*, 522 So. 2d at 244-45 ("We hold that the fraud alleged in this case was not fraud in the inception of the contract, but in fraudulent concealments after the contract was made, and that the facts of this case could support both a breach of contract claim and a fraud claim.")).

---

[18] Defendants also argue that dismissal of the fraud claim is appropriate in light of the "economic loss" rule. It does not seem that the "economic loss" rule is applicable in this context under Alabama law. Defendants only cite to one Alabama case in support of this argument, *Bay Lines, Inc. v. Stoughton Trailers, Inc.*, 838 So. 2d 1013, 1019-20 (Ala. 2002), which does not express a general adoption of the economic loss rule as described by Defendants. (*See* Def. Br. at 10 ("Under that doctrine, plaintiffs who have only suffered economic loss, but no personal or property injury, cannot recover in tort.").) Alabama courts generally discuss this rule in the context of products liability claims where the alleged damage is only to the product itself. *See, e.g.*, *Bay Lines, Inc.*, 838 So. 2d at 1019-20. This is not such a case and dismissal of the fraud claim as it relates to GE's second sourcing is, thus, not based on the economic loss rule.

"Alabama courts have consistently held that, where a party fraudulently conceals or misrepresents facts relating to its intention or ability to perform under a contract, a single transaction can support an award of damages for both breach of contract and fraud." *Combined Servs., Inc. v. Lynn Elecs. Corp.*, 888 F.2d 106, 107 (11th Cir. 1989) (citations and internal quotation marks omitted). On their face, Plaintiff's fraud claims are duplicative of its breach of contract claims, and its fraud claims do not relate to Defendants' intention or ability to perform under the contract. *Compare* Compl. ¶ 43 (alleging breach of contract on the grounds that Defendants failed to "disclose material facts and circumstances concerning GE's qualification of an additional supplier, including that GE had in fact, qualified Hirschmann as an alternate supplier, and that Hirschmann's prices were significantly lower than [Plaintiff's]"), *with id.* ¶ 47 (alleging fraud due to Defendants' alleged "concealment" and "false and/or misleading statements" regarding "important business information . . . including information regarding GE's actual qualification of an additional supplier and the prices to be charged by such supplier").

Plaintiff argues that its "fraud claim is premised not only on the representations in the contract, but also on Nicholson's misrepresentations made after the APA was entered into on August 20, 2010." (Pltf. Opp. Br. at 7.) However, the only alleged misrepresentations that Plaintiff points to are three representations included in the Customer Condition Certification regarding the status of the Hirschmann approval. (*Id.* at 8.) These representations are simply in furtherance of Plaintiff's argument that Defendants' breached Sections 5.21, 5.25, and 5.5 by failing to disclose additional information regarding the timing of GE's approval of Hirschmann in order to make Schedule 5.21 "not misleading." Thus, the basis for its fraud claims is duplicative of the basis for its contract claims and does not give rise to an independent cause of action in tort.

Moreover, for the same reasons Plaintiff's contract claim fails, no reasonable jury could find under these facts that Plaintiff can satisfy all of the elements of a fraudulent inducement or suppression claim. The elements of a fraudulent inducement/misrepresentation claim are: "(1) a misrepresentation of a material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) that was reasonably relied on by the plaintiff under the circumstances, and (4) that caused damages as a proximate consequence." *Id.* at 1275 (citation omitted).

As discussed above, Plaintiff has failed to identify a material fact that was misrepresented. Instead, Plaintiff argues that Defendant Nicholson made representations regarding the timing of Hirschmann's approval that Plaintiff believes are inaccurate or misleading. However, Plaintiff has not and cannot point to any evidence in the record stating when—definitively—Hirschmann was approved. Thus, there is no basis for a reasonable jury to determine that Defendant Nicholson knowingly *misrepresented* a material fact regarding the timing of GE's second source approval.

Plaintiff is also unable to prove a fraudulent suppression claim under its theory that Defendants were legally required to disclose the information in the five emails, *see supra* Section II.A., regarding Hirschmann. Under Alabama law, "[t]he elements of a suppression claim are '(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to [its] injury.'" *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So. 2d 883, 891 (Ala. 2005) (quoting *Lambert v. Mail Handlers Benefit Plan*, 682 So. 2d 61, 63 (Ala. 1996)). Where "parties engage[] in a corporate transaction[,] there is no reason to doubt that, as corporate entities, the parties participated in arm's length negotiations." *Pearson's*, 505 F. Supp.

2d at 1278; *see also Freightliner, L.L.C.*, 932 So. 2d at 894 ("While the law still requires, even in the present adversarial world of commercial transactions, that direct questions be responded to truthfully and accurately, the law also generally allows a business to keep confidential its internal operating procedures.").

Plaintiff is unable to satisfy the standard under Alabama law to succeed on a fraudulent suppression claim.  For example, it cannot "point to a specific question that was directly asked of the defendant[s], the answer to which the defendant[s] misrepresented." *Pearson's*, 505 F. Supp. 2d at 1278.  Plaintiff argues that Defendant Nicholson chose to speak regarding the timing of second source approval and did not provide truthful information.  However, as discussed above, *see supra* Section IV.A., Plaintiff cannot show that Defendant Nicholson's statements were knowingly inaccurate or that he suppressed or concealed facts within his knowledge necessary to make his statements concerning the timing of the Hirschmann approval "not misleading in any material respect." (*See* Appendix A, APA § 5.25.)

Because Plaintiff's fraud claims are dismissed, it is not entitled to punitive damages. Moreover, there is not sufficient evidence that Defendant Nicholson acted wantonly or maliciously in his dealings with Plaintiff.  *Cf. Ex parte Norwood Hodges Motor Co., Inc.*, 680 So. 2d 245, 250 (Ala. 1996) (concluding that "the trial court should have allowed the jury to consider the punitive damages claim" because "[t]here was sufficient evidence to support a finding, by clear and convincing evidence, that Plaintiff consciously and deliberately defrauded Defendant in the sale . . . and that the jury could have believed the fraud was malicious, oppressive, or gross.").

## VI.    CONCLUSION

Defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is instructed to close the motion at ECF No. 68.

Dated: September 9, 2015
      New York, New York

SO ORDERED

GEORGE B. DANIELS
United States District Judge

# Appendix A

## 5.5(a)

**5.5(a)** [S]ince the Balance Sheet Date, there has been . . . no Material Adverse Effect [as defined below].

## 5.11

**5.11 Intellectual Property; Software.**
(f) Except as set forth in Schedule 5.11(f): (i) no infringement, misappropriation, violation or dilution of any Intellectual Property . . . has occurred or results in any way from the operations of the Business; (ii) no claim of any infringement, misappropriation, violation or dilution of any Intellectual Property or any such rights of any other Person has been made or asserted against Seller or any Subsidiary in respect of the operations of the Business . . . (v) neither Seller nor any Subsidiary has had notice of, and, to the Knowledge of Seller, there is no basis for, a claim against Seller or any Subsidiary that the operations, activities, products, Software, equipment, machinery or processes of the Company or any Subsidiary infringe, misappropriate, violate or dilute any Intellectual Property or any such rights of any other Person.

## 5.21

**5.21 Customers and Suppliers.** Except as set forth in Schedule 5.21, there exists no actual or, to the Knowledge of Seller, threatened termination, cancellation or limitation of, or any modification or change in, the business relationship of Seller or any Subsidiary with any customer or group of customers listed in Schedule 5.21 . . . and there exists no present or future condition or state of facts or circumstances involving customers, suppliers or sales representatives which Seller or any Shareholder can now reasonably foresee would have a Material Adverse Effect [as defined below] on the Business or prevent the conduct of the Business after the consummation of the transactions contemplated by this Agreement in essentially the same manner in which it has heretofore been conducted.

## Schedule 5.21

**Schedule 5.21.** The wind division of General Electric Company adopted a policy whereby it is pursuing a second source for its products, which includes Products sold by Seller to General Electric Company.  Accordingly, Seller can make no assurances that the adoption of such policy by General Electric Company will not result in decreased sales of Products to General Electric Company, decreased revenues from such sales and/or decreased profit margins associated therewith.

## 5.25

**5.25 Disclosure.** None of the representations and warranties of Seller or the Shareholders contained herein and none of the information contained in the Schedules referred to in Article V is false or misleading in any material respect or omits to state a fact herein or therein necessary to make the statements herein or therein not misleading in any material respect.  To the Knowledge of Seller, there is no fact which has had, is currently having or in the future is likely to have a Material Adverse Effect [as defined below] which has not been set forth or referred to in this Agreement or the Schedules hereto.

## 1.1

**1.1 Definitions.**

"Material Adverse Effect" means any change, event, development or effect that is or would reasonably be expected to be, individually or in the aggregate, materially adverse to the Purchased Assets, the Business or the operations, liabilities, prospects or condition (financial or otherwise) of Seller and the Subsidiaries (considered as a whole) or to the ability of Seller and the Shareholders to consummate timely the transactions contemplated hereby[.]

## 9.1

**9.1 Indemnification by Seller and the Shareholders.**

(a) Seller and each Shareholder, jointly and severally, agrees to indemnify and hold harmless each Buyer Group Member from and against any and all Losses and Expenses incurred by such Buyer Group Member in connection with or arising from:

(i) any breach of any warranty or the inaccuracy of any representation of Seller or any Shareholder contained in this Agreement[.]